AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>ONE BLACK MOTOROLA MOTO e6 PHONE CURRENTLY<br>LOCATED AT FBI WFO 601 4th Street, Northwest, Washington,<br>D.C.<br>UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>)   Case No.    21-sw-60 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference.

located in the _____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for this search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a) | (Restricted Entry) |
| 40 U.S.C. § 5104(e)(2) | (Unlawful Activities on Capitol Grounds) |
| 18 U.S.C. § 1512(c)(2) | (Obstruction) |
| 18 U.S.C. § 922(g)(1) | (Unlawful Possession of a Firearm) |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Drummond, Special Agent- FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____Telephone_____ *(specify reliable electronic means).*

Date:    _____03/03/2021_____                      _____
                                                                            *Judge's signature*

City and state:  ___Washington, D.C.___             Zia M. Faruqui, United States Magistrate Judge
                                                                            *Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   21-sw-60 |
| ONE BLACK MOTOROLA MOTO e6 PHONE | ) | |
| CURRENTLY LOCATED AT FBI WFO 601 4th Street, | ) | |
| Northwest, Washington, D.C. | ) | |
| UNDER RULE 41 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 15, 2021_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui, United States Magistrate Judge_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   _____03/03/2021_____           _____
                                                          *Judge's signature*

City and state:   _____Washington, D.C._____           _____Zia M. Faruqui, United States Magistrate Judge_____
                                                          *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   21-sw-60 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**


        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.



Date: _____                    _____
                                                                         *Executing officer's signature*

                                                                         _____
                                                                         *Printed name and title*

**ATTACHMENT A**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

The property is a black in color Motorola cellphone which is currently in the

possession of the Federal Bureau of Investigation at the Washington Field Office, 601

4th Street Northwest, Washington, DC.  The photographs below depict the TARGET

DEVICE:





**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED**

This warrant authorizes the search and seizure of the items listed below from the TARGET DEVICE identified in Attachment A, in order to locate property, evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1752(a) (Restricted Entry), 40 U.S.C. § 5104(e)(2) (Unlawful Activities on Capitol Grounds), 18 U.S.C. § 1512(c)(2) (Obstruction), and 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm).

a. Evidence of whether DRESCH used, owned, possessed, or controlled firearms and ammunition.

b. Evidence of who used, owned, or controlled the TARGET DEVICE, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c. Any input/output peripheral devices, passwords, data security devices, and related security documentation that could be related to the TARGET DEVICE;

d. Evidence of software that would allow someone or something other than the user to control the TARGET DEVICE, such as viruses, Trojan horses, spyware, malware, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

e. Evidence of the lack of such malicious software on the TARGET DEVICE;

f.  Evidence of software designed to protect the TARGET DEVICE from other persons, software, devices, or intrusions that may attempt to infiltrate, access, or control the TARGET DEVICE, such as pop-up blockers, security software, password protection, and encryption;

g.  Evidence of other storage devices being attached to the TARGET DEVICE;

h.  Evidence of the times the TARGET DEVICE was used;

i.  Evidence of where the TARGET DEVICE was used, including evidence of wireless Internet networks and Internet Protocol (IP) addresses;

j.  Passwords, encryption keys, and other access devices or programs that may be necessary to access the TARGET DEVICE;

k.  Documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the TARGET DEVICE;

l.  Records of or information about Internet Protocol addresses used by the TARGET DEVICE;

m.  Records of or information about the TARGET DEVICE's Internet activity: firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

-2-

n.  Any and all records, documents, invoices, notes and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of the TARGET DEVICE;

o.  Credit card information, bills, mail, correspondence, and payment records indicating who owns and/or controls the TARGET DEVICE;

p.  Additional documents and records regarding the ownership and/or possession of the TARGET DEVICE; and

q.  Information that constitutes evidence of the identification or location of the user(s) of the TARGET DEVICE;

r.  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the TARGET DEVICE about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

s.  Information that constitutes evidence indicating the TARGET DEVICE user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

t.  Information that constitutes evidence concerning how and when the TARGET DEVICE was accessed or used, to determine the geographic and chronological

context of account access, use, and events relating to the crime under investigation and to the TARGET DEVICE user;

u. Information that constitutes evidence concerning whether KARL DRESCH and/or any other person entered the U.S. Capitol Building on January 6, 2021;

v. Information that constitutes evidence concerning the January 6, 2021, conduct of KARL DRESCH and/or any other person who entered the U.S. Capitol Building on January 6, 2021;

w. Information that constitutes evidence concerning the intent of KARL DRESCH and/or any other person to knowingly enter the U.S. Capitol Building on January 6, 2021;

x. Evidence concerning whether the conduct of KARL DRESCH and/or any other person impeded or disrupted or obstructed the conduct of the U.S. government business or any proceeding or inquiry of Congress on January 6, 2021;

y. Evidence indicating the state of mind of KARL DRESCH and/or any other person on January 6, 2021, while on the way to the Capitol Building, while attempting to enter the Capitol Building, and/or while in the Capitol Building; and

z. Preparatory actions, planning, coordination or communication related to KARL DRESCH's and/or any other person's entry into the U.S. Capitol Building on January 6, 2021.

-4-

aa. Information relating the whereabouts or travel of KARL DRESCH for January 6, 2021, including records of travel to and from Washington D.C., such as receipts, travel itineraries, or maps;

bb. any information pertaining to the identity or location of co-conspirators;

cc. Evidence of user attribution showing who used or owned the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

dd. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE BLACK MOTOROLA MOTO e6 PHONE CURRENTLY LOCATED AT FBI WFO 601 4th Street, Northwest, Washington, D.C. UNDER RULE 41** | **SW No. _____21-sw-60_____** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew J. Drummond, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a digital device—which is currently in law enforcement possession (the "TARGET DEVICE"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since July 2009. I have a Bachelor's Degree in Anthropology from the University of Pennsylvania.  I attended the FBI Academy in Quantico,

Virginia, completing the New Agents Training in November 2009. I am presently assigned to a Public Corruption Squad in FBI's Washington Field Office. As a Special Agent with the FBI, I have conducted criminal investigations related to public corruption, as well as national security investigations related to counterterrorism. My training and experience have involved, among other things, interviewing witnesses and confidential human sources, executing court-authorized search warrants, conducting surveillance, and analyzing documentary and physical evidence. As a federal law enforcement officer, I am authorized to investigate violations of federal law and to execute warrants issued under the authority of the United States. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by criminal offenders. My duties include the investigation of various violations of federal criminal law, including matters involving violations of 18 U.S.C. § 1752(a) (Restricted Entry), 40 U.S.C. § 5104(e)(2) (Unlawful Activities on Capitol Grounds), and 18 U.S.C. § 1512(c)(2) (Obstruction), which are collectively referred to in this affidavit as the "Subject Offenses." My duties also include investigation of violations of other federal

criminal laws, including 18 U.S.C. § 922(g), which relates to the unlawful possession of firearms.

3. This continuation is based on the investigation, observations, and/or experience of myself, FBI Special Agent John Fortunato, as well as other law enforcement officers. I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be revealed during a search of the TARGET DEVICE identified in Attachment A.

4. Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the Subject Offenses, as defined above, have been committed by KARL DRESCH. There is also probable cause to search the TARGET DEVICE, further described in Attachment A, for the things described in Attachment B.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5. The property to be searched is a black Motorola Moto 6E phone, that is, the TARGET DEVICE.

6. The TARGET DEVICE is currently located at the FBI Washington Field Office, 601 4th Street, Northwest, Washington, D.C.

**PROBABLE CAUSE**

*Background – The U.S. Capitol on January 6, 2021*

7.    U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

8.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

9.    The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts

-4-

manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.    On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.    On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.    As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and

USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13. At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14. At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

15. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."   I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

16. At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building,

-6-

no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

17.    Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a

crowd outside the Capitol building, "We're gonna fucking take this," which

your affiant believes was a reference to "taking" the U.S. Capitol.



18. Shortly thereafter, at approximately 2:20 p.m. EST, members of the United

States House of Representatives and United States Senate, including the

President of the Senate, Vice President Mike Pence, were instructed to—and

did—evacuate the chambers.  That is, at or about this time, USCP ordered all

nearby staff, Senators, and reporters into the Senate chamber and locked it

down.  USCP ordered a similar lockdown in the House chamber.  As the

subjects attempted to break into the House chamber, by breaking the windows

on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

19.  At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.   These actions by the unknown

individuals resulted in the disruption and ultimate delay of the vote Certification.

20.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

21.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

22.     At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law

enforcement believes that the word "they" is in reference to members of Congress.



23.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other

comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



24.     One subject left a note on the podium on the floor of the Senate Chamber.  This

note, captured by the filming reporter, stated "A Matter of Time Justice is

Coming."



25.     During the time when the subjects were inside the Capitol building, multiple

subjects were observed inside the U.S. Capitol wearing what appears to be,

based upon my training and experience, tactical vests and carrying flex cuffs.

Based upon my knowledge, training, and experience, I know that flex cuffs are

a manner of restraint that are designed to be carried in situations where a large

number of individuals are expected to be taken into custody.





26.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

27.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

28.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

29.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

30.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful

-15-

entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

31.    Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

32.    Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

33.    Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

34.    During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

35.    Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture

photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

36. Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

*Investigation of Karl Dresch*

37. In this context, on January 7, 2021, the Federal Bureau of Investigation received a tip that Karl DRESCH, a resident of Calumet, Michigan, was at the U.S. Capitol Building the day before and had entered said building without permission or authorization.  The tip indicated that DRESCH had posted information describing his own January 6, 2021, entry onto the U.S. Capitol Building on his Facebook account.  The tipster described the Facebook account,

which included the username "Karl Dresch," and was available online at https://www.facebook.com/karl.dresch.7.

38. Special Agent John Fortunato reviewed publicly available Facebook posts which were posted on the account (referred to here as the "FACEBOOK ACCOUNT") with username Karl Dresch and page located at https://www.facebook.com/karl.dresch.7. Subsequently, on January 12, 2021, United States Magistrate Judge Robin Meriweather issued a search warrant concerning information associated with the FACEBOOK ACCOUNT. Facebook, Inc., responded by providing information and records to the FBI on January 13, 2021.

39. I have reviewed information and records from Facebook and found that, by no later than December 16, 2020, DRESCH posted information to the FACEBOOK account which was focused on the January 6, 2021, certification, and which equated the planned events for January 6, 2021, with the historical events on July 4, 1776. For example, on December 16, 2020, DRESCH posted, "Stop the Steal," and on December 20, 2020, DRESCH posted, "7-4-1776 = 1-6-2021."

40. By January 3, 2021, DRESCH posted that he was preparing to go to "DC." and was "prepared for chemical attacks and what not." He also urged others to do so by way of his FACEBOOK ACCOUNT, writing, "NO EXCUSES! NO RETREAT! NO SURRENDER! TAKE THE STREETS! TAKE BACK OUR

-18-

COUNTRY! 1/6/2021=7/4/1776."  Between January 3, 2021, and January 6, 2021, other posts on DRESCH's FACEBOOK ACCOUNT reflect preparations to arrange travel and then travel to Washington, D.C., for that purpose.

41.    On the FACEBOOK ACCOUNT, DRESCH posted photographs, such as the photograph depicted in Figure 1, below, which show scenes from the U.S. Capitol grounds on January 6, 2021.  The photograph in Figure 1 depicts a group of individuals approaching the U.S. Capitol Building, which can be seen in the background.   The background in the photograph, including the sky and weather conditions as well as the depictions of the crowd, are generally consistent with the depictions which I have seen from news accounts and other reliable sources of photographs and videos of the scene on January 6, 2021. The photograph, including the vantage point displayed in the photograph, is consistent with a photograph taken by someone on the scene using a cellular telephone.

*Figure 1*



42.     Facebook records show that, at about 3:13 p.m. on January 6, 2021, DRESCH

posted the photograph in Figure 2, together with the comment, "Who's house?

OUR HOUSE!"

*Figure 2*



43.     Facebook records show that, at about 3:14 p.m. on January 6, 2021, DRESCH

posted the photograph depicted in Figure 3.  This photograph was posted with

the title, "We are in."  Special Agent John Fortunato shared the post displaying Figure 3 with a U.S. Capitol Police Officer, who confirmed that it accurately depicts the inside of the U.S. Capitol Building, specifically, the "Crypt," a location under the rotunda in the center of the Capitol.

44.     Facebook records also include metadata for the photograph in Figure 3.  The metadata shows that this photograph was taken at 2:26 p.m., using a Motorola "Moto e6" phone.

*Figure 3*



45.     In addition to these photographs, DRESCH also posted, or sent messages containing, videos of the scene inside and around the Capitol during the

conduct under investigation.  For example, DRESCH posted the video depicted

(in still frame), in Figure 4.  Special Agent Fortunato provided Figure 4 to a

member of the U.S. Capitol Police, who works in and is familiar with the U.S.

Capitol Building.  He verified that the photograph in Figure 4 is an accurate

depiction of the U.S. Capitol Visitor's Center, which is inside the U.S. Capitol

and which was closed to the public on January 6, 2021.

*Figure 4*



46.     Facebook records do not specify the date or time that the video in Figure 4 was

taken.     However, at 12:11 a.m. on January 7, 2021, shortly after midnight,

DRESCH posted the video with the comment, "Okay all you conspiracy theorists [winking smiley face emoji] don't worry I loves yous all just setting the record straight.antifa did not take the capitol.that was Patriots, I can't guarantee there weren't some shit birds in the crowd but what multi-million crowd can you guarantee?.don't give them the thunder, we the people took back our house, the news is all bullshit.and now those traitors Know who's really in charge. And I can't say I saw any violence from our people, despite all the poking of the capitol police, gassing randomly into the women and children being peaceful, beating old men we kept chill[.]"

47.    While inside the Capitol, DRESCH also exchanged messages with other Facebook users.  On January 6, 2021, at about 2:43 pm, prior to posting Figures 2 and 3, DRESCH exchanged messages with another Facebook user, referred to here as "USER TWO."  At 2:43 p.m., USER TWO wrote, "Patriots are in the

Capitol building now."  DRESCH responded at 2:44 p.m., writing, "I am," and also sent the photograph depicted in Figure 5.



*Figure 5*



48.    Figure 5 is cropped to ensure that it fits on the page, but the rest of the photograph depicts only the floor.  A complete copy of the photograph was provided to a member of the U.S. Capitol Police, who stated that the photo appeared to depict inside the Capitol Visitor's Center, and that it appears to

show the part of the Visitor's Center that is closer to the House of Representatives.

49. USER TWO wrote at 2:48 p.m., that, "Word is police are getting ready to use tear gas." DRESCH responded, "Been using it. Mask up."

50. DRESCH also corresponded with a Facebook user referred to here as "USER THREE." According to Facebook records, at 5:17 p.m., DRESCH sent USER THREE a "selfie" or self-portrait photograph, together with the message, "Just had a beer on our front porch." Figure 6 is a copy of that "selfie" photograph, which shows DRESCH outside of the Capitol Building.

*Figure 6*



-25-

51.     A minute later, at about 5:18 p.m., DRESCH sent USER THREE the same photograph depicted above in Figure 3, together with the comment, "That's right outside the house of representative...we got in! Took a lil gas ...wtf I love masks now!"

52.     DRESCH provided additional context about the scene, writing to USER THREE, "Had the cops booking it." He did not explain further or provide any additional photographs.

53.     DRESCH also responded to other people's comments on Facebook.   For example, at about 4:46 p.m., in response to another post, DRESCH wrote, "It was peaceful…still got a lil gas tho…mask on for safety[.]"   In response to another person who wrote about the individuals who were breaking into the Senate and House chambers and breaking glass and shoving officers, at around 6:09 p.m., DRESCH wrote, "we broke no glass no shoving I seen[.]"

54.     Later that evening, DRESCH expressed his approval of the events of the day. At about 8:32 p.m., commenting on a picture of a crowd at the Washington Monument, DRESCH posted, "Total Victory!"   At 8:44 p.m., DRESCH posted, "I'm excited!"   The next day, on January 7, 2021, at about 9:36 a.m., DRESCH commented on an unidentified post that, "Mike Pence gave our country to the communist hordes, traitor scum like the rest of them, we have your back give the word and we will be back even stronger."   The underlying post belonged to

another Facebook user, and Facebook's production of information and records here did not include a copy of that post or identify its user.

55. Finally, on January 8, 2021, around 11:35 a.m., DRESCH sent another user the photograph depicted in Figure 7. Facebook records do not include the date or time the photograph was taken. However, I provided a copy of the photograph to a member of the U.S. Capitol Police, who stated that the photograph was taken in the Crypt of the U.S. Capitol, the same location as Figure 3, and that it showed the statute of John Caldwell Calhoun. In addition, I reviewed the photograph closely and compared it with the "selfie" photograph in Figure 6. I noticed that the person pictured in both photographs appears to be wearing the same distinctive clothing – a jacket or blazer-style jacket and a plaid multicolor shirt with some reddish coloring, over a hooded sweatshirt, and a baseball-style cap. The photograph for Figure 7, which depicts more of the subject's body, also shows that the subject was wearing dark-colored pants or jeans, black gloves, and reflective sunglasses, and carrying large flags.

*Figure 7*



56.     In addition, I have reviewed a copy of DRESCH's Michigan Driver's License

picture and compared it to the profile pictures for the FACEBOOK ACCOUNT,

as well as the "selfie" depicted in Figure 6.    Based on the comparison between

those two pictures, I believe that there is probable cause to believe that both

pictures depict DRESCH.   I further believe, based on a comparison of those pictures with Figure 6 and Figure 7, as well as the other evidence described above (including the description of clothing), that there is probable cause to believe that all of these pictures depict DRESCH.

57.   Finally, Facebook records show that the FACEBOOK ACCOUNT is associated with a mobile telephone number, ███████████.   The FACEBOOK ACCOUNT was frequently accessed from IP addresses that, according to publicly available WHOIS records, are registered to Verizon Wireless and its affiliates.   In addition, a search of law enforcement databases, which in my training and experience are reliable sources of this type of information, also show that ███████████ was serviced by Verizon Wireless and its affiliates.

58.   On January 19, 2021, the FBI conducted surveillance of DRESCH's residence, which is the premises located at ███████████████████████████.   Shortly after observing DRESCH at the residence on that date, law enforcement arrested DRESCH outside the residence.

59.   In connection with the arrest of DRESCH, law enforcement seized the TARGET DEVICE from DRESCH.   The TARGET DEVICE is a black in color Motorola cellphone.   The TARGET DEVICE is currently in "airplane mode," which means that it will not receive signals.   In addition, the exterior of the TARGET DEVICE does not identify its model, and as a result it has not been positively confirmed

whether the TARGET DEVICE is a Motorola Moto e6.  The TARGET DEVICE

is currently in the possession of the FBI at the FBI Washington Field Office, 601

4th Street Northwest, Washington, DC.    The photographs below depict the

TARGET DEVICE:





60.     Later on January 19, 2021, after DRESCH was arrested, the FBI executed search

warrants at DRESCH's residence, and on DRESCH's vehicle.  These searches

led to the recovery of additional evidentiary items, but did not result in the seizure of any other cellphones.[1]

61.    In addition, during execution of the search warrant at DRESCH's residence, agents recovered additional evidence, including a bag which contained a receipt from a hotel in Washington, D.C.  The physical appearance of the bag was consistent with the appearance of the bag depicted in Figure 7.

62.    Agents also observed, inside the same bag, eight boxes of 7.62 ammunition, which is the type of ammunition consistent with a rifle.  The bag also contained a handheld CB radio, a Whistler laser/radar detector, a D.C. Metro Pass, and a hotel receipt for a hotel in Chantilly, Virginia, for Karl DRESCH for an arrival date of January 5, 2021, and a departure date of January 7, 2021, among other items. The photographs below depict the boxes of 7.62 ammunition, the CB radio, and the laser/radar detector:

---

[1] The agents executing the search warrants observed one cellphone in the residence, but it appeared dusty and had a cracked screen, did not appear to have been in recent use, and was an LG-brand phone, not a Motorola phone.

-32-





63.     The home was unoccupied and unsecured, and agents knew that DRESCH had previously been convicted of a crime punishable by more than one year in prison. Specifically, in 2014, in Florence County Circuit Court in Wisconsin, in Case No. 2013CF000010, DRESCH was convicted of Fleeing and Eluding an Officer, in violation of Wisconsin Statutes 941.30(1), a Class I Felony which is punishable by more than one year in prison.

64.     During execution of the search warrant, agents also observed, in plain sight in an upstairs bedroom, a gun bag which, in plain sight, appeared to be a bag designed to hold a rifle. Agents opened the bag and found that it contained a Russian SKS-style rifle with a bayonet affixed to the barrel. The rifle was designed to fire 7.62 ammunition, consistent with the type of ammunition recovered from the bag. Agents also recovered upstairs, in plain sight, a shotgun.

65.     On January 22, 2021, at 2:45 pm, Magistrate Judge Maarten Vermaat of the Western District of Michigan authorized by telephone a search warrant to search TARGET DEVICE.  Due to logistical issues, the FBI was not able to execute this search warrant from the Western District of Michigan before it expired on February 4, 2021.

66.   On or about February 3, 2021, DRESCH was indicted by a federal grand jury sitting in the District of Columbia for violations of 18 U.S.C. § 1512 (obstruction of a federal proceeding); 18 U.S.C. § 1752 (a)(1) (entering and remaining in a restricted building or grounds); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds); 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building).

67.   Based on the evidence above, including the video and images above, I submit that there is probable cause to believe that DRESCH used a Motorola Moto e6 cellphone to record the video and images described above, and to post, or publish, the video, images, and writings described above on social media accounts.  I further submit that there is probable cause to believe that DRESCH uses a cellular phone with the telephone number +1-906-231-1623.

68.   The TARGET DEVICE was transferred to the FBI Washington Field Office on or about January 27, 2021. It is currently being held in evidence at the Washington Field Office in Washington D.C. Following execution of this search warrant, the FBI will transfer the TARGET DEVICE to the Washington Field Office's Northern Virginia Resident Agency in Manassas, Virginia for extraction and exploitation of data.

69.   Based on the foregoing, as well as the additional technical information below, I respectfully submit that there is probable cause to search the TARGET DEVICE described in Attachment A, for the items described in Attachment B, and that said items will constitute and contain evidence of the Subject Offenses.

## TECHNICAL TERMS

70.   Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

-36-

personal calendars; and accessing and downloading information from
the Internet.  Wireless telephones may also include global positioning
system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as
digital picture files, rather than by using photographic film.  Digital
cameras use a variety of fixed and removable storage media to store their
recorded images.  Images can usually be retrieved by connecting the
camera to a computer or by connecting the removable storage medium
to a separate reader.  Removable storage media include various types of
flash memory cards or miniature hard drives.  Most digital cameras also
include a screen for viewing the stored images.  This storage media can
contain any digital data, including data unrelated to photographs or
videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or
iPod) is a handheld digital storage device designed primarily to store
and play audio, video, or photographic files.  However, a portable media
player can also store other digital data.  Some portable media players can
use removable storage media.  Removable storage media include various
types of flash memory cards or miniature hard drives.  This removable

storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

-38-

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps,

-39-

which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

-40-

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

71. Based on my training, experience, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

72. As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICE, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in

Attachment B will be stored in the TARGET DEVICE for at least the following reasons:

a.        Individuals who engage in the criminal activity described above utilized cellular telephone devices, like the Target Device, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other

things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.          Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.          Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block

-43-

of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."   The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.   Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

73.   As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that

this forensic electronic evidence and information will be in any of the Target Device(s) at issue here because:

a.          Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration

-45-

data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.          Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence

of who used or controlled the digital device at a relevant time, and potentially who did not.

c.        A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.        The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.        Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.   For example, the presence or absence of counter-forensic programs, anti-

-47-

virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

74. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.        Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain

specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of

particular data or software on a digital device is not segregable from the digital device itself.   Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.        Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.   For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as

-50-

searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.       Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that

-51-

cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.        Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined

search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

75.   In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.   The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking

at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used

in searching the contents of the Target Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

76.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Jennifer Leigh Blackwell, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

77.     Based on the above factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of criminal offenses in violation of 18 U.S.C. § 1752(a) (Restricted Entry), 40 U.S.C. § 5104(e)(2) (Unlawful Activities on Capitol Grounds), 18 U.S.C. § 1512(c)(2) (Obstruction), and 18 U.S.C. § 922(g) (Unlawful Possession of a Firearm) may be found on the TARGET DEVICE described in Attachment A.

78.     I, therefore, respectfully request that the attached warrant be issued authorizing

the search and seizure of the items and evidence identified in Attachment B.

Respectfully submitted,

Matthew J. Drummond
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone, this 3rd day of March 2021.

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE